IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO

FRANK J.  DOMBOS,

        Petitioner,

v.                                        CIV 09-0200-JB-GBW

JAMES JENECKA, Warden,
Lea County Correctional Facility,
and GARY KING, New Mexico
Attorney General,

        Respondents.

**PROPOSED FINDINGS AND RECOMMENDED DISPOSITION**

THIS MATTER is before the Court on Petitioner Frank Dombos' application for a writ of habeas corpus pursuant to 28 U.S.C. § 2254.  Since Dombos filed his petition after the effective date of the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), its standards apply to this case.  *E.g., Abdul-Kabir v. Quarterman,* 550 U.S. 233, 246 (2007); *DeLozier v. Sirmons,* 531 F.3d 1306, 1319 (10th Cir. 2008).  All of the issues can be resolved on the record before me, and, therefore, an evidentiary hearing is unnecessary.  *Sandoval v. Ulibarri*, 548 F.3d 902, 915-16 (10th Cir. 2008).   After a careful review of the record and pleadings in this case, the Court recommends Dombos' petition be denied on the merits.

## FACTUAL BACKGROUND

The following facts, unless otherwise stated, derive primarily from the testimony of Mrs. Dombos, Petitioner's wife, and the complaining witness in his state criminal case. *See W.T.*, Vol. II at 184-331, *W.T.*, Vol. III at 452-465.  Petitioner met Ellen Dombos in late November 2003 in Tucson, Arizona.  *Id.* at Vol. II. at 191-192.  Petitioner and Mrs. Dombos quickly developed a friendship and, within a few days, began living together.  *Id.* at 194. The relationship that developed between the two involved a routine of daily drinking to the point of intoxication, talking, sleeping, and having consensual sexual intercourse.  *Id.* at 195-199.  Neither party worked, but Mrs. Dombos was living on Social Security disability benefits she received for having diabetes and depression.  *Id.* at 205-206.  In spite of several violent episodes resulting in the hospitalization of Mrs. Dombos, the couple married in early January 2004 – just a little more than a month after their first meeting.  *Id*. at 202-204. By February 1, 2004, Petitioner and Mrs. Dombos had moved to Alamogordo, New Mexico, where they continued the lifestyle they had begun in Arizona.

According to Mrs. Dombos, from February 1 until February 20, 2004, she felt she was being held captive by Petitioner.  *Id.* at 256-258.  Mrs. Dombos testified that there were several occasions when she would awaken to find Petitioner tying her wrists and ankles. *Id.* at 226-227.  He would talk to her while she was tied up and tell her stories.  *Id.*  While she was bound, Petitioner would not attempt any sexual activity, but he would sometimes

try and force her to have oral sex with him after he untied her.  *Id.* at 227-228.

Sometime around February 18, 2004, Mrs. Dombos developed a painful bladder infection, which led her to call a halt to the couple's daily, consensual sexual intercourse. *Id.* at 213, 217-220.  On the evening of February 20, 2004, Mrs. Dombos was awakened by Petitioner anally penetrating her.  *Id.* at 212, 218.  She testified that Petitioner told her that, because her infection prevented her from having vaginal sex and because she would not perform oral sex, there was only one other way.  *Id.* at 218.  Mrs. Dombos testified that she screamed and begged Petitioner to stop but that he would not.  *Id.*  After Petitioner finished and went to the bathroom, Mrs. Dombos called 911 claiming that she could not breathe. *Id.* at 222.  Petitioner came into the room and knocked the phone out of Mrs. Dombos' hand. *Id.*  Mrs. Dombos was taken to the hospital, and Petitioner accompanied her.  *Id.* at 223.  At the hospital, Mrs. Dombos told an emergency room physician about the sexual assault, and Petitioner was arrested.  *Id.* at 235.

Sometime after Petitioner's arrest, Mrs. Dombos discovered a video tape in her camcorder.  *Id.* at 243-244.  She testified that she was surprised to find the video contained scenes of herself in situations she did not remember.  *Id.* at 245-246.  The scenes were sexual in nature and included a scene of a hand sodomizing someone with a carrot.  *Id.* at 253-254. Mrs. Dombos testified that she recognized the arm and sweater in the video as Dombos' and that she was the one being sodomized.  *Id.* at 254.  She testified that she recognized the

3

room shown in the video as the bedroom of their New Mexico home.  *Id.* at 246-248.   She was so upset that she pushed the record button to tape over the video right before she vomited.  *Id.* at 244.  At some point, she stopped recording over the tape and called the police, who came and took the tape from her.  *Id.* at 245.

For his part, Petitioner has given conflicting statements about whether he and Mrs. Dombos had sex on February 20, 2004.  When he was first interviewed on February 21, 2004, after being arrested he denied committing any offenses but did admit to having sexual intercourse with his wife on February 20, 2004.  *Doc. 60*, Att. 7, p. 20.  When questioned whether he had anal sex with his wife on February 20, 2004, he first responded that they had not, later stated that they probably had, and then said they absolutely had. *Id.* at 20 (saying they did not have anal sex);  *id.* at 23 (saying they possibly had anal sex); *id.* at 36 (saying they did have anal sex).  When Petitioner testified before the grand jury on March 3, 2004, he claimed that the last time he and Mrs. Dombos had anal sex was two days on February 18, 2004, but that they had consensual vaginal sex the afternoon of February20, 2004.  *Id.* at 48.  Petitioner did not testify at his trial.

## **PROCEDURAL BACKGROUND**

Following a three-day jury trial beginning on February 21, 2005, Dombos was found guilty of the following crimes: (1) one count of False Imprisonment, NMSA 1978, §30-04-03, a 4th degree felony, a lesser included offense of 1st degree kidnaping, NMSA 1978, §30-04-

4

1(A)(1); (2) one count of Criminal Sexual Penetration, NMSA 1978, §30-09-11(A)(D)(3), a 2nd degree felony; (3) one count of Interference with Communications, NMSA 1978, §30-12-1(D), a misdemeanor; (4) two counts of Kidnaping, NMSA 1978, §30-4-1(A)(4), a 1st degree felony; (5) two counts of Criminal Sexual Penetration (Attempt), NMSA 1978, §30-9-11(A)(D)(3) & §30-28-1, a 3rd degree felony; (6) three counts of Battery on a Household Member, NMSA 1978, §30-3-15, a misdemeanor; and (7) one count of Criminal Sexual Penetration, NMSA 1978, §30-9-11(A)(E), a 3rd degree felony. *Doc. 60*, Ex. A.  As a result of the foregoing, Dombos was sentenced to a total term of fifty-nine and one half years on May 20, 2005. *Id.*

Dombos filed a timely Notice of Appeal on June 2, 2005, and, on January 16, 2008, the New Mexico Court of Appeals (NMCA) affirmed his conviction. *Doc. 60*, Exs. D & M. Dombos then filed a petition for writ of certiorari on January 31, 2008, which the New Mexico Supreme Court (NMSC) denied on February 27, 2008. *Id.* at Exs. N & O.  On July 10, 2008, Dombos filed a Motion for Post Conviction Relief for D.N.A. Testing. *Id.* at Ex. Q.  That petition was denied on August 26, 2008. *Id.* at Ex. T.  On February 6, 2009, Dombos filed an application for state habeas relief but it was denied on March 9, 2009. *Id.* at Ex. QQ. Dombos sought certiorari review of that denial, but the NMSC denied certiorari on April 2, 2009. *Id.* at Exs. RR & SS.

Dombos filed his federal habeas application on February 26, 2009. *Doc. 1.*  At that

time, Dombos' appeal of the D.N.A. petition denial was still pending.  Consequently, on September 8, 2009, this Court stayed the proceedings pending the resolution of that appeal. *Doc. 45.*  After his state court cases were finalized,[1] this Court lifted the stay and issued an Order for Dombos to amend his petition.[2]  He submitted his amended petition on March 15, 2010, and Respondent filed his answer on May 17, 2010.  *Docs. 70 & 77.*

On June 23, 2010, I submitted Proposed Findings and Recommended Disposition recommending that Petitioner's ineffective assistance of counsel claims be deleted because they were unexhausted.  *Doc. 81.*  The district judge adopted my proposed findings on August 4, 2010, (*Doc. 85*), and Dombos filed a certificate deleting his unexhausted claims on August 16, 2010, (*Doc. 16*).  Petitioner also filed an interlocutory appeal to the Tenth Circuit on August 16, 2010.  *Doc. 88.*  The Tenth Circuit dismissed the appeal since no final judgment in this case has been entered.  *Doc. 93.*  The Court now reviews Dombos' amended application below.

---

[1]  The NMCA affirmed the denial of the D.N.A. petition on June 23, 2009.  *Doc. 60,* Ex. CC.  Dombos then sought a writ of certiorari from the NMSC, but was denied certiorari on October 13, 2009.  *See id.,* Exs. GG & HH.

[2] Dombos' first petition sought to incorporate by reference his state habeas petition which made his federal application approximately 1,315 pages long.  The Order instructed Dombos to submit a petition not to exceed fifty handwritten pages or twenty-seven pages double-spaced.  *See Doc. 64.*

## STANDARD OF REVIEW

Under AEDPA standards, if a state court addresses a claim on the merits, a federal court cannot grant an "application for a writ of habeas corpus" unless the State decision was (1) "contrary to" or an "unreasonable application" of "clearly established" Supreme Court precedent or (2) an "unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d). The Supreme Court and the Tenth Circuit have discussed these deferential AEDPA standards in detail in many opinions, and I will not reiterate them here.[3] These standards apply to decisions on the merits regardless of whether the State opinion is conclusory. *See Aycox v. Lytle,* 196 F.3d 1174, 1177-78 (10th Cir. 1999). The "determination of a factual issue made by a State court shall be presumed to be correct. The applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence." 28 U.S.C. § 2254(e)(1).

Furthermore, even if a federal habeas court finds that the state court decision was "contrary to" or "unreasonable" and a violation of constitutional dimension, habeas relief may not issue unless the violation is of a sort that warrants such relief. *E.g., Terry Williams v. Taylor,* 529 U.S. 362, 375 (2000) ("It is, of course, well settled that the fact that

---

[3] *E.g., Panetti v. Quarterman,* 551 U.S. 930, 953-54 (2007) (and cases cited therein); *Fry v. Pliler,* 551 U.S. 112, 119-120 (2007) (same); *Wilson v. Sirmons,* 536 F.3d 1064, 1073-74 (10th Cir. 2008), *rehearing en banc granted on separate issue,* 549 F.3d 1267 (10th Cir. 2008); *House v. Hatch,* 527 F.3d 1010, 1018-20 (10th Cir. 2008); *DeLozier,* 531 F.3d at 1319; *Johnson v. Mullin,* 505 F.3d 1128, 1133-34 (10th Cir. 2007).

constitutional error occurred in the proceedings that led to a state-court conviction may not alone be sufficient reason for concluding that a prisoner is entitled to the remedy of habeas."); *Wilson v. Sirmons,* 536 F.3d 1064, 1073 (10th Cir. 2008) ("If we find that the state court erred, we still must determine whether the error is a structural defect 'in the constitution of the trial mechanism, which def[ies] analysis by "harmless-error" standards.'") (quoting *Arizona v. Fulminante,* 449 U.S. 279, 309 (1991), *rehearing en banc granted on separate issue,* 549 F.3d 1267 (10th Cir. 2008)).

## ANALYSIS

Dombos alleges numerous claims in his federal habeas application.  His remaining claims can be broken down into four main categories: (1) prosecutorial misconduct; (2) grand jury indictment concerns; (3) erroneous trial court ruling on amendment; and (4) actual innocence.  The Court reviews Dombos' claims and, where appropriate, applies the deferential standards set out in § 2254(d) and (e) bellow.

## I.    **Prosecutorial Misconduct**:

Dombos makes several allegations related to prosecutorial misconduct.  For efficiency sake, I will break them down into the following subsets: (1) prosecutor's remarks during closing argument violated Petitioner's Due Process Rights; (2) failure to disclose exculpatory evidence under *Brady v. Maryland*, 373 U.S. 83 (1963); (3) presenting false testimony; (4) grand jury violations; and (5) other miscellaneous claims.  The Court

considers each claim in turn.

    1.    Remarks During Closing Argument:

    Dombos' contends that the prosecutor, Mr. Key, referred to him as a "liar," a "sexual deviant," and a "monster" during closing arguments. *Doc. 70* at 2. Construing his Petition liberally, he argues that this was a violation of his due process rights. *Id.* A review of the audio recording and unofficial trial transcript[4] of the trial confirms that Mr. Key did reference Dombos in the alleged ways. *C.T. 23* from trial; *W.T.*, Vol. IV at 584. This claim was adjudicated on the merits during Dombos' direct appeal by the NMCA. *See State v. Dombos*, 143 N.M. 668, 678 (Ct. App. 2008). As a result, this Court reviews this claim under the deferential standard set out in § 2254(d).

    The prosecutor did indeed make the remarks described by Petitioner and the NMCA

_____

    [4] This Court received twenty-seven (27) cassette tape recordings of Petitioner's state criminal trial as part of the Record Proper. Subsequently, it was discovered that written transcripts of the trial existed. The Court ordered Respondent to submit these transcripts to supplement the Record Proper. *Doc. 86*. On August 24, 2010, this Court received 5 volumes of written transcripts from Respondent of Petitioner's criminal trial. *Doc. 92*. It is now clear that none of the proceedings in Petitioner's state criminal trial were stenographically recorded. However, while Dombos' case was on direct appeal before the NMCA, the public defender filed a Motion to Transcribe the twenty-seven (27) trial tapes through a transcription program. *Doc. 92*, Ex. A. The NMCA granted the motion. *Id.* at Ex. B. This Court acknowledges that the cassette tapes are the official state court record and, should an ambiguity occur in the transcript, the Court will refer to the tapes prepared by the state district court. Any reference to the cassette tapes will be cited as "*C.T.*" followed by the sequential tape number. Any reference to the written transcript will be referenced as "*W.T.*" followed by the volume and page number.

agreed that the comments "improperly sought to depict Defendant as an evil person." *Dombos*, 143 N.M. at 678.  Nonetheless, the NMCA held that "[a]lthough we discourage the use of such language, we cannot say that these comments fall within the categories of conduct that would deprive Defendant of a fair trial."  *Id.* (*citing State v. Armendariz*, 140 N.M. 712, 720 (Ct. App. 2006)).

Under the federal Constitution, "[w]here prosecutorial misconduct does not implicate a specific constitutional right, improper remarks require reversal of a state conviction only if the remarks so infected the trial with unfairness as to make the resulting conviction a denial of due process."  *Bland v. Sirmons*, 459 F.3d 999, 1024 (10th Cir. 2006) (quotation omitted).  This is a demanding standard and "not every improper or unfair remark made by a prosecutor will amount to a federal constitutional deprivation." *Tillman v. Cook*, 215 F.3d 1116, 1129 (10th Cir. 2000); *see also Darden v. Wainwright*, 477 U.S. 168, 181 (1986) ("[I]t is not enough that the prosecutors' remarks were undesirable or even universally condemned.") (quotation omitted)); *Bland*, 459 F.3d at 1024 ("The ultimate question is whether the jury was able to fairly judge the evidence in light of the prosecutors' conduct").  To determine whether a prosecutor's improper statements violate a petitioner's due process rights, the court must "examine the entire proceeding, 'including the strength of the evidence against the petitioner, both as to guilt at that stage of the trial and as to moral culpability at the sentencing phase' as well as '[a]ny cautionary steps - such

as instructions to the jury - offered by the court to counteract improper remarks.'" *Id.* (*quoting Le v. Mullin*, 311 F.3d 1002, 1013 (10th Cir. 2002)).

In the instant case, the prosecutor's "argument did not manipulate or misstate the evidence, nor did it implicate other specific rights of the accused such as the right to counsel or the right to remain silent." *Darden*, 477 U.S. at 181. Moreover, evidence of Dombos' guilt was significant, and the jury was instructed to consider only witness testimony, attorneys' stipulations, and exhibits as evidence. *W.T.*, Vol. IV at 549-551; *see Bland*, 459 F.3d at 1015 ("The jury is presumed to follow its instructions, even when there has been misleading argument." (internal citation omitted)). In these circumstances, the NMCA's holding that the remarks did not deprive Dombos of a fair trial is neither contrary to clearly established Supreme Court precedent nor an unreasonable determination of the facts in light of the evidence presented in the state court proceeding. *See* 28 U.S.C. § 2254(d); *see also Malicoat v. Mullin*, 426 F.3d 1241, 1256 (10th Cir. 2005) (concluding that improper statements by the prosecutor did not violate the defendant's due process rights in light of "the strength of the state's case and the fact that the majority of the prosecutor's argument was based upon evidence in the record"); *Hooper v. Mullin*, 314 F.3d 1162, 1173 (10th Cir. 2002) (concluding that the prosecutor's improper comments regarding the evidence did not violate due process when the evidence was substantial and the trial court instructed the jury to base its decision only on the evidence). Accordingly, the holding is

entitled to deference and I recommend this claim be dismissed.

    2.    <u>Alleged *Brady* Violations</u>:

Dombos contends that the state violated his constitutional rights by withholding a number of items of allegedly exculpatory evidence.  Criminal convictions obtained by presentation of known false evidence, or by suppression of exculpatory or impeaching evidence, violate the due process guarantees of the Fourteenth Amendment.  *Napue v. Illinois*, 360 U.S. 264, 269 (1959); *see also Giglio v. United States*, 405 U.S. 150, 153-54 (1972). More specifically, in *Brady v. Maryland*, the Supreme Court held that "the suppression by the prosecution of evidence favorable to an accused . . . violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution."  373 U.S. at 87.  Exculpatory evidence is material only if "there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different.  A 'reasonable probability' is a probability sufficient to undermine confidence in the outcome." *Bagley*, 473 U.S. at 682. "The mere possibility that an item of undisclosed information might have helped the defense, or might have affected the outcome of the trial, does not establish 'materiality' in the constitutional sense." *United States v. Agurs*, 427 U.S. 97, 109-110 (1976).  The Supreme Court has further refined the *Brady*/*Bagley* materiality standard as follows:

> *Bagley's* touchstone of materiality is a "reasonable probability" of a different
> result, and the adjective is important. The question is not whether the

12

> defendant would more likely than not have received a different verdict with
> the evidence, but whether in its absence he received a fair trial, understood
> as a trial resulting in a verdict worthy of confidence.

*Kyles v. Whitley*, 514 U.S. 419, 434 (1995) (*citing Bagley*, 473 U.S. at 678).

Importantly, in the context of a case where, as here, the government disclosed the allegedly exculpatory evidence but did so belatedly, "as long as ultimate disclosure is made before it is too late for the defendant to make use of any benefits of the evidence, Due Process is satisfied." *United States v. Mendez*, 514 F.3d 1035, 1047 (10th Cir. 2008) (quotation omitted). Moreover, Dombos bears the burden of presenting evidence to establish a *Brady* violation. *Foster v. Ward*, 182 F.3d 1177, 1191 (10th Cir. 1999). It is also Petitioner's burden under 28 U.S.C. § 2254(d) to show how the state court's determination of this issue was contrary to clearly established federal law as set forth by the Supreme Court, or that there was an unreasonable application of such law to the facts of this case.

*Police Scene Photographs and Rape Kit* – Dombos first complains about the late disclosure of police scene photos of Petitioner's home and the existence of a rape kit performed on Mrs. Dombos at the emergency room the night of the alleged rape. *Doc. 70* at 2-5. The prosecutor disclosed the photos and rape kit on February 18, 2005, three days prior to the beginning of trial. *See Record Proper* at 196-98.[5] Dombos contends that the late disclosure of the police scene photos prevented him from being able to prove that a video

---

[5] This citation shall be abbreviated "*R.P.*" hereinafter.

13

tape shown at trial was fabricated by the victim in the case.[6]  *Id.*  He claims that the rape kit

would have exculpated him by showing that he did not have any sexual relations with Mrs.

Dombos on February 20, 2004.[7]  *Id.*

The prosecutor disclosed the relevant photographs taken at Dombos' home and the

existence of a rape kit three days before trial.  *C.T.* dated 2/18/2005; *see also Doc. 60*, At. 7,

pp. 7-75 (copy of transcript of hearing).  That same day, as a result of the belated disclosure

of these items, the prosecutor requested that the court continue the trial.  *Id.*  The

prosecutor informed the court and counsel that the rape kit had never been tested and,

while he questioned its relevance, he thought that a continuance should be granted so that

Petitioner would have the benefit of using the results of the rape kit if they were helpful

to him.  *Id.*  However, Dombos, through counsel, indicated that he did not want a

_____

[6] As discussed above, there was a video tape discovered by Mrs. Dombos which contained a recording of her in compromising positions.  The video tape was shown to the jury during trial.  One of Petitioner's strategies at trial was to show that the tape was fabricated, as he maintains now.

[7] Dombos argues that "I have said <u>many times</u>, I did not have sex with Ellen on the night of 2-20-2004 . . . so these rape kits were invaluable – to support her story – or mine.  We had no sex – on Friday night 2-20-2004."  *Id.* at 3 (emphasis in original).  Dombos, however, did testify at the grand jury that he and Mrs. Dombos had sex in the afternoon of February 20, 2004.  *Doc. 60*, Att. 7, p. 48.  So, the results of the rape kit would have been far from the absolute arbiter imagined by Dombos.  In fact, as the NMCA found in Dombos' appeal of the denial of his D.N.A. petition, "the record proper confirms that there was no issue as to identity, only as to consent by the victim." *Doc. 60*, Ex. CC at 5.  Consequently, the NMCA agreed that "DNA testing would not have been helpful to Defendant's case."  *Id.* at 3.  Therefore, even if Dombos had not waived this argument, the rape kits were not exculpatory under *Brady*.

continuance.  *Id.*  Apparently, despite his counsel's opinion that they should wait to see if the results of the rape kit were exculpatory, Dombos was suspicious that the rape kit had been tampered with due to the late disclosure and did not want to wait any longer for his trial.  *Id.*  The trial judge then addressed Dombos directly saying:

> It sounds to me like the evidence that has been turned up here, it would be in your interest to be able to have that evidence and make use of that evidence.  I mean, I wouldn't have a whole lot of trouble not allowing the state to introduce that evidence but it sounds to me as if your attorney feels like that evidence may be helpful to you and while I wouldn't bar you from using it, it sounds like at least the rape kit would not, the results of the rape kit test would not be available to you.  Now you may question the results of it, but you can't question the results of it if it's never tested.  And so, is it your desire to go to trial on Monday without that evidence or would you prefer that I postpone the trial no later than March the 22nd, which would be one additional month basically, and a couple of days, in order to make sure that all that evidence is available to you for your use in your defense?

*Id.*  Despite being clearly advised of the stakes, Dombos indicated that he objected to a continuance and wanted his trial to begin as originally scheduled in three days.  Consequently, the State withdrew its motion for continuance and the trial was held three days later.  *Id.*

Petitioner was aware of the belatedly disclosed evidence three days before his trial.  The State conceded that it would not be able to introduce the evidence and moved for a continuance to give Petitioner an opportunity to use the evidence if he wished.  Petitioner's attorney and the court advised him that a continuance would be wise.  The court gave Petitioner the choice of moving back the trial for more than a month.  These circumstances

15

demonstrate that Petitioner intentionally relinquished[8] his right to have sufficient time to utilize the evidence he now claims is exculpatory.  *See United States v. Olano*, 507 U.S. 725, 733 (1993) ("[W]aiver is the 'intentional relinquishment or abandonment of a known right.'").  When an individual waives a right, he is not entitled to post-conviction relief. *United States v. Teague*, 443 F.3d 1310, 1314 (10th Cir. 2006).  In these circumstances, Petitioner clearly waived any prejudice caused by the tardy disclosure.  *See United States v. Williams*, 132 F.3d 1055, 1060 (5th Cir. 1998) (defendant waived argument that he was prejudiced by disclosure of *Brady* material during trial when he elected not to take advantage of court's offer of a continuance); *see also United States v. Burke*, 571 F.3d 1048, 1055-57 (10th Cir. 2009) (where defendant's continuance motion based upon *Brady* disclosure during trial is denied, defendant's failure to present evidence of prejudice from the delay to the trial court means the argument is forfeited).  Accordingly, these claims should be dismissed.

 *Diabetic Logbook and Letter* – Dombos also describes other allegedly exculpatory items

---

 [8]  Dombos now claims that there were two other rape kits which were never disclosed.  *Doc. 70* at 3.  He claims that the state's failure to inform him of their existence denied him a "fair opportunity" to make a rational decision about whether or not to have a continuance to get the kits tested.  *Id.*  However, Dombos has not provided the Court any evidence of these two other rape kits.  Moreover, Dombos argues the rape kits were relevant because they would have shown that he did not have sex with Mrs. Dombos on the relevant date.  *Id.*  Assuming that basis of relevance, it is unclear why Dombos would have agreed to the trial continuance if he had known about all three rape kits when he objected to a continuance when he knew of only one rape kit.

which were disclosed on the "eve of trial" – Mrs. Dombos' diabetic logbook and a letter from Mrs. Dombos in which she expressed her belief that Dombos had tampered with her insulin. *Doc. 70* at 7. It appears that these two items were disclosed to Dombos at the same time as the police scene photos and rape kit because of Dombos' similar usage of the "eve of trial" description for each of these disclosures. *Id.* at 2-7. In any event, there is no dispute that they were disclosed to Dombos prior to trial and that his attorney was in possession of these documents when Mrs. Dombos testified. Given that the claimed relevance would have been to impeach Mrs. Dombos, Petitioner was able to make use of the benefits of the evidence despite the late disclosure. *See Mendez*, 514 F.3d at 1047. Moreover, as with the police scene photos and rape kit, Dombos clearly waived any prejudice caused by the tardy disclosure when he objected to a continuance of the trial. *See Williams*, 132 F.3d at 1060. Therefore, these claims should also be dismissed.

*Insulin* – Dombos argues that the prosecutor failed to disclose "samples of Ellen Dombos'es [sic] three different insulins which, if analyzed would establish that Dombos was <u>not</u> tampering with her insulins." *Doc. 70* at 7 (emphasis in original). An implicit prerequisite of any *Brady* claim is that favorable material evidence actually exists. Here, no analysis of the insulin was conducted, so no evidence about its purity or impurity existed. Dombos' *Brady* claim presupposes that, if testing had been conducted, exculpatory evidence would have emerged. However, *Brady* "does not stand for the proposition that

the prosecution must perform any forensic tests that may inure to the benefit of the accused." *Armijo v. Tapia*, 288 Fed. Appx. 530, 534 (10th Cir. 2008) (*citing United States v. Marrero*, 904 F.2d 251, 261 (5th Cir. 1990)).  Given the lack of exculpatory evidence in the possession of the prosecution regarding the insulin, I recommend dismissing this claim.

*Wedding Video* – Dombos complains that the prosecutor failed to disclose the Dombos' wedding video which was allegedly exculpatory evidence because it "would show that [the] wedding was a happy one."  *Doc. 70* at 7.  However, "a defendant's independent awareness of the exculpatory evidence is critical in determining whether a *Brady* violation has occurred."  *United States v. Quintanilla*, 193 F.3d 1139, 1149 (10th Cir. 1999).  If a defendant is aware of and can present the exculpatory evidence, no *Brady* violation can be sustained.  *See United States v. Erickson*, 561 F.3d 1150, 1164-65 (10th Cir. 2009).  Dombos, of course, would have been aware of the existence of the wedding video and the happiness depicted therein.  There is no evidence that Dombos was prevented from introducing the wedding video during his case-in-chief assuming its relevance. Accordingly, I recommend this claim be dismissed.

*Mrs. Dombos' Conviction for Security Fraud* – Despite Dombos' claim that the prosecutor failed to disclose this conviction, the trial transcript demonstrates that the defense was aware of the conviction.  On cross-examination, defense counsel asked Mrs. Dombos, "And you had a little bit of a problem with a security fraud charge there, didn't

18

you?" *W.T.*, Vol. II at 262.   Mrs. Dombos responded, "Yes.  The entire company had a problem."  *Id.*   As explained above, if a defendant is aware of and can present the exculpatory evidence, no *Brady* violation can be sustained.  *See Erickson*, 561 F.3d at 1164-65.  Accordingly, I recommend this claim be dismissed.

*Thrifty Nickle Ads* – Dombos also claims that the prosecutor failed to disclose a copy of the February 2004 edition of the Thrifty Nickle paper which included advertisements for a pewter collection and a music box collection.  *Doc. 70* at 7.  Dombos explains that the paper is visible in the police scene photos and contradicts Mrs. Dombos' testimony about her lack of knowledge about the pewter collection.  *Id.*  This *Brady* claim also fails for two reasons.  As described above, the police scene photos were disclosed before trial.  Dombos was given the opportunity to continue the trial to fully utilize the photographs.  However, he chose to go forward with the trial and therefore waived any prejudice caused by the tardy disclosure.  *See Williams*, 132 F.3d at 1060.  Moreover, Dombos personally, more than anyone on the prosecution side, would have been aware of the existence of the Thrifty Nickle ad and its significance to him and Mrs. Dombos.  Because he was aware of the exculpatory evidence and could have presented it, his *Brady* claim fails.  *See Erickson*, 561 F.3d at 1164-65.  Therefore, this claim should also be dismissed.

3.    Presenting Allegedly False Testimony:

A  prosecutor  who  knowingly  presents  false  evidence  violates  due  process,

regardless of whether the evidence is relevant to substantive issues or to witness credibility only.  *Napue v. Illinois*, 360 U.S. 264, 269 (1959).  "In order to establish a due process violation, [a petitioner] must show that (1) [the witness's] testimony was in fact false, (2) the prosecution knew it to be false, and (3) the testimony was material."  *United States v. Caballero*, 277 F.3d 1235, 1243 (10th Cir. 2002).

Dombos contends that the prosecutor, Mr. Key, suborned perjurious testimony from witnesses at trial.  *Doc. 70* at 5-6.  Specifically, he contends that Deputy Lisa Delorem and Mrs. Dombos lied about the location at which the tube of K-Y Jelly was found and lied about the location pictured in the incriminating videotape.  *Id.* at 2-7.

With respect to the K-Y Jelly, Dombos claims that the K-Y Jelly was not in the bedroom, but was instead in the bathroom.  *Id.* at 5-6.  Dombos claims that the prosecutor instructed the Deputy Delorem to lie about this fact and say "the K-Y Jelly tube was found exactly where Ellen Dombos said it was, corroborating her story to a Tee – the rape story."  *Id.* at 5.  However, at trial,[9] Deputy Delorem was not asked and did not testify about the

---

[9]  While Dombos does not directly complain of the knowing use of perjured testimony before the grand jury, he does occasionally cite to grand jury testimony in support of this argument.  To the extent that he is making a claim about such testimony before the grand jury, it must fail.  "*Napue*'s prohibition on the state's knowing use of false evidence thus does not apply to [a claim focused on testimony before the grand jury] because even if [false testimony was presented] to the grand jury, Petitioner's conviction was not 'obtained through [its] use.'"  *United States v. Coleman*, 2009 WL 1904370, *11 (N.D. Ill. 2009) (*quoting Napue*, 360 U.S. at 269).

precise location of the K-Y Jelly.  Deputy Delorem testified only that a tube was seized from the home pursuant to a search warrant.  *W.T.*, Vol. I at 53, 58, 65.  In fact, when questioned on cross-examination whether she was "present when K-Y Jelly was found, any K-Y Jelly was found," Deputy Delorem answered, "No I wasn't present at the time, no, sir."  *W.T.*, Vol. I at 88.  No other witness testified about the precise location of the K-Y Jelly.  So, Dombos' allegation about this alleged perjury fails on its face.

With respect to the location pictured in the incriminating videotape, Dombos claims that the location pictured was not his home in New Mexico, but was instead his home in Arizona.  *Doc. 70* at 2-7.  He claims that the "prosecutor had his witnesses lie, knowingly at trial that the . . . videotape was made in my N.M. home."  *Doc. 70* at 2.  To be precise, neither Deputy Delorem nor Mrs. Dombos testified that they had direct knowledge about the making of the videotape.  Deputy Delorem testified that the location of "various things in the bedroom" such as the window and the carpet matched the bedroom in the New Mexico home.  *W.T.*, Vol. I at 80-81.  These matches led her to conclude that the videotape pictured events which occurred in the New Mexico home.  *Id.*  Mrs. Dombos admitted that she had no independent memory of the events on the videotape.  *W.T.*, Vol. II at 248.  She also testified that the items in the background matched the bedroom in the New Mexico home.  *W.T.*, Vol. II at 246-248.  Consequently, she also concluded that the videotape pictured events which occurred in the New Mexico home.  *Id.*

Petitioner's sole evidence that these witnesses' testimony was false and that the prosecutor knew it was false is an alleged discrepancy between the photographs taken by the police at the New Mexico house, the videotape, and the testimony of Deputy Delorem and Mrs. Dombos.  Specifically, Petitioner argues that a "comparison with the videotape to the police scene materials, and review of the testimony of both Ellen Dombos, and Deputy Delorm [sic] at trial, proves this.  Especially there [sic] testimony about a window next to the bed in our N.M. bedroom.  The police scene photos of my N.M. home clearly show a solid wall, the bed rest against.  The videotape shows a window next to the nightstand, so I was framed in the classic sense . . . " *Doc. 70* at 3.  First, the allegation of a dramatic and obvious discrepancy about the window's location does not survive a close review of the record.  Deputy Delorem, in fact, did not specifically testify about where the window was located.  She testified only that the location of "various things in the bedroom" such as the window and the carpet as seen in the videotape matched the bedroom in the New Mexico home.  *W.T.*, Vol. I at 80-81.  Mrs. Dombos' only testimony about the window's location was as follows:

> Q:  And if I would imagine a queen size bed being against the wall and I was looking towards the bed, towards the (inaudible), where would the window be?
> A:  On the left side --
> Q:  Left side.
> A:  On my side.
> Q:  Your side of the bed.
> A:  Um-hmm.

*W.T.*, Vol. II at 247.  The Court has reviewed the photographs which Dombos claims are the police photographs of the New Mexico bedroom.  *See Doc. 60*, Att. 5, pp. 33-35.  Assuming these photographs are of that relevant bedroom, they show the bed and the wall against which the head of the bed rests.  No window appears on that wall.  However, none of the photographs show a significant portion of the other walls in the bedroom.  I find that Mrs. Dombos' testimony quoted above would be consistent with describing a window on the left wall of the bedroom – one that would not appear in the photographs referenced by Dombos.  Given this finding, I conclude that there is insufficient evidence that the testimony of Deputy Delorem or Mrs. Dombos was false.  *See Herrera v. Collins*, 506 U.S. 390, 401 (1993) ("Federal courts are not forums in which to relitigate state trials.").

More fundamentally, Dombos has presented no evidence that the prosecutor knowingly presented false testimony.  *See United States v. Caballero*, 277 F.3d at 1243. Dombos' claim that the  "prosecutor had his witnesses lie" is a conclusory allegation.  *See Hall v. Bellmon*, 935 F.2d 1106, 1110 (10th Cir. 1991) (conclusory allegations alone, without supporting factual averments, are insufficient to state a valid claim); *see also Ruark v. Gunter*, 958 F.2d 318, 319 (10th Cir. 1992) ("[N]aked allegations" are not cognizable under 28 U.S.C. § 2254).  Moreover, the allegation is completely undermined by the fact that the very photographs Dombos relies upon were disclosed to his attorney by the prosecutor.  *See C.T.* dated 2/18/2005.  While Dombos complains that these photographs were disclosed only

three days prior to the trial, the prosecutor asked the court to continue the trial to permit Dombos to fully absorb and utilize the newly-disclosed evidence. *Id.* To accept Dombos' conclusory allegation, one would have to believe that the prosecutor, who was instructing his witnesses to lie, was still willing to risk disclosing to the defense photographic evidence which exposed the perjury he was suborning while asking the court to continue the trial to give the defense more time to review that very evidence.

Because there is insufficient evidence that the disputed testimony was false and there is no evidence that, even if it were false, the prosecutor knowingly presented false testimony, I recommend this claim be dismissed.

4. Failure to Present Exculpatory Evidence to Grand Jury:

Next Dombos claims that the prosecution failed to present exculpatory evidence to the grand jury. *Doc. 70* at 5-6. While New Mexico state law requires the presentation of clearly exculpatory evidence to a grand jury, no such duty exists under the federal Constitution. *See United States v. Williams*, 504 U.S. 36, 51 (1992). Therefore, no federal habeas relief is available for such a claim and I recommend it be dismissed.

5. Procedural Rule Violations

In addition to the claims discussed above, Dombos also makes general allegations of prosecutorial misconduct throughout his petition. Some of Dombos' claims are difficult to decipher, but the Court will address them to the best of its ability. First, Dombos alleges

24

that the prosecutor lied to the court by signing court documents signifying that he was in compliance with discovery rules when he was not. *Doc. 70* at 4. Secondly, Dombos alleges that the prosecutor failed to disclose that the daughter of Mrs. Dombos was going to testify prior to trial in violation of his due process rights along with NMRA, Rule 5-505.[10] *Doc. 70* at 6.

As discussed above, a portion of evidence was belatedly disclosed to Dombos prior to his trial. The lateness of these disclosures may indeed have broken discovery obligations imposed by the state trial court. However, federal habeas relief is available "only on the ground that he is in custody in violation of the Constitution or laws or treaties *of the United States*." 28 U.S.C. § 2254(a) (emphasis added)); *see also Estelle v. McGuire, 502 U.S.* 62, 67-68 (1991) (In conducting habeas review, a federal court is limited to deciding whether a conviction violated the Constitution, laws, or treaties of the United States"). In the discussion *supra* regarding *Brady* violations, the Court has concluded that Dombos cannot make a claim under the federal constitution relating to the late discovery. Because the violation of a state rule which does not rise to the level of a violation of the federal constitution is not a cognizable cause of action under federal habeas review, I recommend

_____

[10] The rule provides that: "If . . . a party discovers additional material or witnesses which he would have been under a duty to produce or disclose at the time of such previous compliance if it were then known to the party, he shall promptly give written notice to the other party or the party's attorney of the existence of the additional material or witnesses." NMRA, Rule 5-505(A).

dismissal of the claim related to the discovery obligations.  Similarly, the alleged violation[11] of the witness disclosure rule does not rise to the level of a violation of the federal constitution is not a cognizable cause of action under federal habeas review.  Accordingly, I recommend dismissal of that claim.

Dombos also claims that the prosecutor "violated the ten-day rule."  *Doc. 70* at 4. Dombos does not specify the rule to which he is referring or the manner in which it was violated.  After a review of the New Mexico Rules of Criminal Procedure, the Court assumes Dombos is referring to NMRA, Rule 5-302 which requires that a "preliminary hearing shall be held within a reasonable time but in any event not later than ten (10) days following the initial appearance . . . ."  Dombos has failed to provide any facts to demonstrate that this rule was violated[12] or what prejudice[13] he suffered as a result.

_____

[11]  Moreover, a review of the record shows that the prosecution did put Dombos on notice that Mrs. Dombos' daughter could be called as a witness.  *See R.P.* at 33 (Disclosure of Witnesses).  This issue was discussed at a pre-trial hearing on February 21, 2005.  *C.T.* dated 2-21-2005.  Dombos' counsel objected to the state being able to call Mrs. Dombos' daughter as a witness and the judge found that, because her name was included in discovery and police reports, Petitioner was sufficiently on notice that she could have been called as a witness.  *Id*.

[12]  For instance, Dombos was indicted by the grand jury and a defendant who is indicted by grand jury in New Mexico does not have a right to preliminary hearing. *Woods v. State*, 84 N.M. 248, 249 (Ct. App. 1972).

[13]  The Court notes that, absent a showing of prejudice, delay in holding a preliminary hearing is not a denial of due process.  *State v. Olguin*, 78 N.M. 661, 663 (1968).

Consequently this is another conclusory allegation which is insufficient to state a valid claim. *See Hall v. Bellmon*, 935 F.2d at 1110.

## II.   Grand Jury Indictment Concerns

Dombos presents ill-defined complaints about the grand jury's indictment. He contends that the prosecutor "changed the essential element of the 2nd degree [Criminal Sexual Penetration charge], and 3rd degree [Criminal Sexual Penetration] count (the video tape rape charges) from 'mental anguish' . . . to physical injury . . . right after I was indicted by the grand jury. . .." *Doc. 70* at 4. Dombos argues that this alleged change "denied me my rights to a grand jury by the prosecutor, due process, by not re-submitting the erroneous indictment to grand jury." *Id.* at 5.

Dombos presents no evidence of the prosecutor changing the charge on the indictment after the grand jury issued it. Consequently this is another conclusory allegation which is insufficient to state a valid claim.[14] *See Hall v. Bellmon*, 935 F.2d at 1110.

_____

[14]  Given the lack of clarity about Dombos' claim about the indictment, the Court will also construe Dombos' allegation as a complaint about the way the grand jury was instructed or some other error in the procedures before the grand jury. Even under this construction, federal habeas relief would not be available. First, the Supreme Court has stated that the harm caused by errors in grand jury procedure are rendered harmless by a "petit jury's subsequent guilty verdict[, which] means not only that there was probable cause to believe that the defendants were guilty as charged, but also that they are in fact guilty as charged beyond a reasonable doubt. Measured by the petit jury's verdict, then, any error in the grand jury proceeding connected with the charging decision was harmless beyond a reasonable doubt." *United States v. Mechanik*, 475 U.S. 66, 73 (1986); *but c.f. Bank of Nova Scotia v. United States*, 487 U.S. 250, 256 (1988) (not

Dombos does cite to the grand jury transcript, but the Court can find no evidence of the allegations in the transcript.  Accordingly, I recommend dismissal of this claim.

## III.  Trial Court Ruling on Amendment

Dombos alleges that the trial court erred when it allowed the state to amend the indictment at trial to allow for an enlarged time period of occurrence for the alleged violations.  *Doc. 70* at 34.  The original indictment charged that one count each of kidnaping, attempted criminal sexual penetration, and battery allegedly occurred "on or between February 9, 2004, and February 18, 2004," and that another set of charges for the same crimes allegedly occurred "on or about February 19, 2004." *R.P.* at 2-3. The State

---

applying harmless error reasoning if defendant sought dismissal of indictment prior to trial).  Even if there are exceptions to this rule, "the circumstances justifying dismissal of the indictment after conviction must be so severe, the prosecutorial misconduct so 'blatant,' as to 'call into doubt the fundamental fairness of the judicial process.'" *Goodrich v. Hall*, 448 F.3d 45, 50 (1st Cir. 2006).  If Dombos' allegations are something less then the naked claim that the prosecutor substantively altered the indictment after it was issued by the grand jury, it would not constitute one of those "very rare" circumstances.  *Id.*

Finally, as the Tenth Circuit has held, the "remedy of dismissal of indictment is an extraordinary one applied to insure proper standards of conduct by the prosecution. An indictment may be dismissed for prosecutorial misconduct so flagrant that there is some significant infringement on the grand jury's ability to exercise independent judgment.  Challenges going only to the instructions given to the grand jury as to the elements of the offenses are not grounds for dismissal of an indictment that is valid on its face." *United States v. Buchanan*, 787 F.2d 477, 487 (10th Cir. 1986) (citations omitted). Therefore, if Dombos' claim is that the prosecutor improperly instructed the grand jury about the crime of criminal sexual penetration, that claim would fail on its merits because the indictment is valid on its face and the petit jury was properly instructed.

moved to change the dates on all of these charges to enlarge the time of occurrence to "on or between February 1 and February 19." *C.T. 17* from trial. Defendant objected to the amendments on the ground that he had prepared his defense based on the original dates alleged in the indictment. *Id.* The trial court found that the changes would not prejudice Defendant and granted the State's motion. *Id.*

Unless an alleged trial court error "had substantial and injurious effect or influence in determining the jury's verdict," the error is harmless. *Brecht v. Abrahamson*, 507 U.S. 619, 631 (1993) (quoting *Kotteakos v. United States*, 328 U.S. 750, 776 (1946)). Here, this issue was reviewed by the NMCA which found that there was no error on the part of the trial court allowing amendment of the indictment. *Dombos*, 143 N.M. at 683. Specifically, the court of appeals concluded that: "We disagree with Defendant's contention that the trial court erred when it permitted the State to amend the dates of some of the acts alleged in the indictment midway through trial. Rule 5-204(C) NMRA[15] permits the trial court to amend the indictment to conform to the evidence at any time prior to the verdict." *Id.* The court further held that there was no prejudice established by Dombos. *Id.* Specifically, the court explained that

---

[15] NMRA 5-204 provides in relevant part: "The court may at any time prior to a verdict cause the complaint, indictment or information to be amended in respect to any such defect, error, omission or repugnancy if no additional or different offense is charged and if substantial rights of the defendant are not prejudiced."

> Defendant knew the nature of the charges and knew the identity of the victim.  He also knew that all the charges were alleged to have occurred during the period of time he and Ms. Dombos lived together in Alamogordo - that is, between February 1 and February 20, 2004.  Nothing in Defendant's cross-examination of the witnesses at trial or in the presentation of his case relied upon the specific dates charged in the earlier indictment."

*Id.*  This holding is entitled to deference as it is neither contrary to clearly established Supreme Court precedent nor an unreasonable determination of the facts in light of the evidence presented in the state court proceeding.  *See* 28 U.S.C. § 2254(d); *Wilson*, 536 F.3d at 1073-74.  Accordingly, Mr. Dombos' claim of trial court error should be dismissed.

## IV.    Actual Innocence

Dombos' petition is replete with general allegations that there was a miscarriage of justice in his case.  Construing his petition very liberally, it can be read to include a freestanding claim of actual innocence.  The Supreme Court has never held that a freestanding claim of actual innocence is cognizable under habeas corpus, but recently reiterated that it is an open question.  *See Dist. Attorney's Office for Third Judicial Dist. v. Osborne*, 129 S. Ct. 2308, 2321 (2009).  A review of the relevant Supreme Court dicta on the issue reveals that such a claim, if ever recognized, would most likely be in the context of a case involving a sentence of death.  *See House v. Bell*, 547 U.S. 518 (2006); *Schlup v. Delo*, 513 U.S. 298 (1995); *Herrera v. Collins*, 506 U.S. 390 (1993).

Even if such a claim existed, the burden of proof upon a petitioner would be very high.  As the *Herrera* court explained, "because of the very disruptive effect that

entertaining claims of actual innocence would have on the need for finality in capital cases, and the enormous burden that having to retry based on often stale evidence would place on the States, the threshold showing for such an assumed right would necessarily be **extraordinarily high**." 506 U.S. at 417 (emphasis added). The Court has also indicated that such a right would require "more convincing proof of innocence than *Schlup*." *House*, 547 U.S. at 555. Therefore, one looks to *Schlup* which required a showing that "**no juror**, acting reasonably, would have voted to find [the defendant] guilty beyond a reasonable doubt." *Schlup*, 513 U.S. at 329 (emphasis added). A review of these cases has led at least one court in a well-reasoned opinion to conclude, in freestanding actual innocence claims, a petitioner must show "by clear and convincing evidence that no reasonable juror would have convicted him in light of the new evidence." *In re Davis*, 2010 WL 3385081, *45 (S.D. Ga. Aug. 24, 2010).

Regardless of the precise nature of the "extraordinarily high" burden a petitioner must satisfy to prevail on a freestanding actual innocence claim, Dombos is not even close. The overwhelming majority of the evidence which he claims was not presented to the trial court involves matters of relatively minor impeachment of Mrs. Dombos. While she was an important witness, a number of other witnesses corroborated her account. Even assuming a vigorous cross-examination of Mrs. Dombos with all the material Dombos has collected in his Petition, this Court cannot conclude that **no reasonable juror** could have

31

convicted Dombos of the charges.  Accordingly, I recommend this presumed claim be dismissed.

## CONCLUSION

Dombos alleges various claims of prosecutorial misconduct, grand jury indictment concerns, trial court error and actual innocence.  After a review on the merits, the Court concludes that Dombos has failed to establish that he is entitled to habeas corpus relief on any of these claims.  Accordingly, his claims and his petition should be dismissed with prejudice.

Wherefore, **IT IS HEREBY RECOMMENDED THAT:**

Dombos' § 2254 habeas petition be dismissed with prejudice.

**THE PARTIES ARE FURTHER NOTIFIED THAT WITHIN 14 DAYS[16] OF SERVICE** of a copy of these Proposed Findings and Recommended Disposition they may file written objections with the Clerk of the District Court pursuant to 28 U.S.C. § 636(b)(1). **A party must timely file any objections with the Clerk of the District Court if that party wants to have appellate review of the proposed findings and recommended disposition. If no objections are filed, no appellate review will be allowed.**

_____
UNITED STATES MAGISTRATE JUDGE

---

[16] Pursuant to an earlier Order (*Doc. 102*), Dombos will be permitted an additional 3 days (i.e. 17 days from service) to file his objections.