IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO

FRANK J.  DOMBOS,

        Petitioner,

v.                                  CIV 09-0200-JB-GBW

JAMES JENECKA, Warden,
Lea County Correctional Facility,
and GARY KING, New Mexico
Attorney General,

        Respondents.

## REPORT AND RECOMMENDATION

**THIS MATTER** comes before the Court upon a review of the record and Orders of this Court regarding supplementation of the record. *Docs. 127, 129.* Having now received and reviewed the additional materials, this Court renews its recommendation that Petitioner's claims of prosecutorial misconduct be dismissed on the merits.

## I.    PROCEDURAL HISTORY

On October 25, 2010, I entered my Proposed Findings and Recommended Disposition ("PFRD") concerning Petitioner's application for the Writ of Habeas Corpus. *Doc. 104.* Therein, I recommended that Judge Browning dismiss, on the merits, Petitioner's various claims of prosecutorial misconduct, grand jury misconduct, erroneous trial court rulings, and actual innocence. *Id.* at 9-32.

On February 4, 2011, Judge Browning sustained in part and overruled in part Petitioner's "Written Objections to the Proposed Findings and Recommended Disposition" ("Objections to the PFRD"). *Doc. 127*. First, Judge Browning sustained Petitioner's objections to the PFRD's recitation of the time line related to his state habeas claim. *Id.* at 4. Additionally, Judge Browning sustained three of Petitioner's objections to the PFRD's findings on his claims of prosecutorial misconduct. *Id.* at 9-11. These included the PFRD's findings concerning (1) Petitioner's claims of improper closing argument, (2) the significance of evidence presented against Petitioner at trial, and (3) Petitioner's claims of *Brady* and *Giglio* violations committed by the prosecutor. *Id.* Notably, Judge Browning did not sustain these final three objections on the merits. *Id.* To the contrary, Judge Browning crafted his ruling so that I might review additional evidence suggested by Petitioner, and thereafter, ascertain whether that proffer changed my recommendation on these claims. *Id.* at 10-11. Apart from these claims, Judge Browning overruled all Petitioner's remaining objections. *Id.* at 5-8, 11-13.

Contemporaneous with this ruling, Judge Browning held that Petitioner could supplement the record with additional evidence. *See doc. 124.*[1] Since that time, Petitioner

---

[1]       In the relevant Order, Judge Browning recounted Petitioner's request "that the Court supplement the record with incident reports form the state court, tape logs, a video tape shown at trial, a taped interview of Ellen Dombos with a deputy, police scene photographs, a letter E. Dombos wrote, and his grand-jury transcripts." *Doc. 124* at 3. Judge Browning also observed that "[Petitioner] alleges that the evidence he wishes to add to the record would clearly show that E. Dombos, the complaining

has proffered two Supplements for this Court's review.  *Docs. 131, 133*.  Recognizing Petitioner's inability to secure certain evidentiary materials, I ordered Respondents to produce the videotape introduced at Petitioner's trial, the taped interview of Ms. Ellen Dombos ("E. Dombos") by Deputy Sheriff Lisa Delorem ("Deputy Delorem"), the transcript of that interview, and legible copies of photographs taken of the crime scene. *Doc. 129* at 2-3.  With the exception of the taped interview between E. Dombos and Deputy Delorem, Respondents produced all the requested materials on February 23, 2011.  *Doc. 132*.

## II.   DISCUSSION

As mentioned above, both parties have now supplemented the record with additional evidence.  These supplementary materials are detailed below.

### A.   Evidence Proffered to Supplement the Record

#### 1.   Petitioner's First Supplement

Petitioner filed his "First Supplement to the Record of Evidence" ("Supplement") on February 16, 2011. *Doc. 131*.  Along with additional argument, this Supplement contains three attachments, each of which has been previously examined by this Court.  *See id.*

---

witness in his case, was lying," and by Petitioner's estimation, would support the "claims in his federal habeas petition."  *Id.* (citation omitted).  Because the record proper "does not include all of the evidence to which [Petitioner] refers," Judge Browning allowed Petitioner "to supplement the record with evidence," while also expressly prohibiting Petitioner from supplementing the record "with additional argumentation." *Id.* at 4.

These include: (1) a letter from Wells Fargo concerning his former bank account and copies of two related checks; (2) a page from Petitioner's trial transcript; and (3) another letter from Wells Fargo regarding his closed bank account. *Id.* at 4-9; *see also* R. Proper 1040-42, 1044; Trial Tr. vol. 2, 287, Feb. 22, 2005.

## 2.  Petitioner's Second Supplement

On February 22, 2011, Petitioner filed his "2nd Supplement to the Record of Evidence" ("Second Supplement"). *Doc. 133.* Unlike the Supplement filed by Petitioner one week prior, this Second Supplement does not attempt to provide the Court with additional evidence. *See id.* To the contrary, the Second Supplement directs the Court to fifty-eight (58) separate citations of evidence that Petitioner extracted primarily from the exhibits attached to Respondents' "Answer to Petition for Writ of Federal Habeas Corpus (28 U.S.C. § 2254)" ("Answer"). *Doc. 60.*[2] Moreover, many of these fifty-eight (58) citations contain more than one reference to material in the record.[3]   As in Petitioner's First

---

[2]    All materials attached to this pleading, including those now specifically cited by Petitioner, were reviewed by this Court in preparation of its original PFRD recommending dismissal of Petitioner's claims.

[3]  Specifically, Petitioner cites to the following evidentiary materials: (1) trial testimony given by E. Dombos, Trial Tr. vol. 2, 184-331, Feb. 22, 2005, vol. 3, 452-66, Feb. 23, 2005. (seven citations); (2) prosecutor's closing argument at trial, *Id.* vol. 4, 574-608, 639-44, Feb. 24, 2005 (five citations); (3) trial testimony of Deputy Delorem, *Id.* vol. 1, 38-121, Feb. 21, 2005 (five citations); (4) interview of E. Dombos by Deputy Delorem, Resp'ts' Answer, attach. 48 at 24-44, attach. 49 (four citations); (5) tape log minutes of Petitioner's divorce hearing, *Id.* attach. 22 at 13-22 (three citations); (6) tape log minutes of Petitioner's pre-trial motions hearing, *Id.* attach. 71 at 17-21 (three citations); (7) Grand Jury testimony of Deputy Delorem, *Id.* attach. 44 at 8-16, 19-42 (three citations);

Supplement, Petitioner includes substantial additional argumentation in his Second

Supplement.  *See id.*

        **3.**      **Respondents' Supplement**

On February 23, 2011, Respondents complied with this Court's Order to supplement

the record.  *Doc. 132.*  Attached to this "Notice Re: Filing of Tape, Interview Transcript and

Police Scene Photographs; and Notification of Victim's Death," Respondents proffer three

---

(8) bank records and correspondence, *Id.* attach. 20 at 36-37, attach. 21 at 1-17, attach. 35 at 4 (three citations); (9) Grand Jury transcripts generally, *Id.* attach. 37 at 22-36, attach. 38, attach. 39 at 1-3, 9-14, 47-52, attach. 44 at 8-16, 19-42 (three citations); (10) Grand Jury testimony of Sergeant Leon Ledbetter, R. Proper 2127-39 (three citations); (11) pretrial disclosure list, Resp'ts' Answer, attach. 52 at 3-4 (two citations); (12) disclosure list and certificate filed by prosecutor, *Id.* attach. 14 at 31-32 (two citations); (13) prosecutor's opening statement, Trial Tr. vol. 1, 9-28 (two citations); (14) Pima County police reports, Resp'ts' Answer, attach. 26 at 4-5, 13, attach. 40 at 24-26 (two citations); (15) police scene photographs, *Id.* attach. 15 at 21-22, attach. 16 at 1-7 (two citations) (Color copies of these photographs were provided by Respondents as an attachment to *Doc. 132)*; (16) Respondents' Answer generally, *Doc. 60* (one citation); (17) affidavit for search warrant of Petitioner's residence, R. Proper 18-21 (one citation); (18) text of search warrant for Petitioner's residence, *Id.* at 17 (one citation); (19) letter written by E. Dombos, Resp'ts' Answer, attach. 17 at 26-33 (one citation); (20) affidavit of Mr. John Shampton, *Id.* attach. 18 at 3-4 (one citation); (21) Petitioner's Amended Grand Jury Indictment, R. Proper 158-61 (one citation); (22) Response to Petitioner's Motion for Psychological Examination, *Id.* at 51-52 (one citation); (23) tape log minutes of hearing on Petitioner's Second Request for Psychological Examination, *Id.* at 114-19 (one citation); (24) tape log minutes of hearing held on February 4, 2005, *Id.* at 141-44 (one citation); (25) affidavit of Ms. Agnes Shampton, Resp'ts' Answer, attach. 20 at 35 (one citation); (26) testimony of Kim Montoya, Trial Tr. vol. 2, 332-63 (one citation); (27) order of the New Mexico Court of Appeals ("NMCA"), Resp'ts' Answer, attach. 73 at 31-36, attach. 74 at 1-23 (one citation); (28) closing argument of Petitioner's counsel, Trial Tr. vol. 4, 574-609 (one citation); (29) certificate of transcription for interview of E. Dombos by Deputy Delorem, Resp'ts' Answer, attach. 48 at 24 (one citation).  Pet'r's Second Supplement 1-12.

exhibits for the Court's review.  Among these, Respondents have attached a transcript of the interview Deputy Delorem conducted of E. Dombos on February 21, 2004.[4]  Further, Respondents have submitted seventy (70) color photographs of Petitioner's New Mexico trailer home, thirty-five (35) of which are distinct and printed to full-page scale, and thirty-five (35) of which are duplicates of these photographs, reduced for viewing to four photographs per page.[5]  These photographs, which were taken inside Petitioner's New Mexico home, document the following:

 (1) the kitchen;

 (2) a corner occupied by boxes, a fan, and a mirror;

 (3) a trash can containing, among other things, an empty bottle of vodka and cigarette butts;

 (4) a trash can containing, among other things, empty beer cans and cigarette butts;

 (5) a surface containing, among other things, two cell phones and a blood pressure monitor;

 (6) a land line telephone, suitcase, and periodical;

 (7) a mattress lifted to reveal a carrot and sash lying near the center of the boxspring;

 (8) among other items, boxes of .38 caliber handgun ammunition;

 (9) clothing in a closet;

---

[4]   Although no video or audio recording of this interview has been produced as ordered, the transcription of the interview and certificate of its transcription suffice for purposes of this review.

[5]   The final of these four-print pages contains only three photographs.

(10) facing the head of the bed from its foot, the various items near the improvised night stand on the right side of the bed;

(11) an unknown white article lying next to the bed;

(12) contents of a closet;

(13) a room containing a mirror, boxes, and a window;

(14) an empty liquor bottle sitting in a box;

(15) a door to the trailer home;

(16) the porch area of the trailer home;

(17) a side view of the trailer home;

(18) a storage unit;

(19) a chain-link fence and a dog;

(20) a different angle on the mattress lifted to reveal a carrot and sash lying in approximately the center of the boxspring;

(21) various items appearing in the trailer home's living room;

(22) another photograph of the various items near the improvised night stand on the right side of the bed, when facing it;

(23) two tubes of what appear to be medication near the improvised night stand on the right side of the bed, when facing it from its foot;

(24) a wider view of the items lying near the right side of the bed, when facing it from its foot;

(25) a view of the items on the left side of the bed, when facing it from its foot;

(26) the sheets on the bed;

(27) the bed, two nightstands, surrounding items, and the wall behind the head of the bed;

(28) a tube of K-Y jelly on top of a towel, over-the-counter medication, and various other items;

(29) a bathroom, containing assorted toiletries and clothing hanging on the wall;

(30) a bathroom;

(31) a laundry appliance and the view into the master bedroom from the exterior hallway;

(32) among other things, a half-empty bottle of vodka next to the refrigerator;

(33) the hallway leading to the master bedroom;

(34) the living room;

(35) a different angle on the surface containing, among other things, two cell phones and a blood pressure monitor.

Lastly, Respondents have provided the Court a copy of the VHS videotape introduced at Petitioner's trial.

### a.       Contents of VHS videotape

Respondents' final proffer is the VHS videotape ("videotape") introduced and published to the jury at Petitioner's trial. In total, this videotape contains roughly fifty-five (55) minutes of footage. Of these fifty-five (55) minutes, approximately one minute consists of dynamic footage. The remaining fifty-four (54) minutes convey static images of carpet captured at close range.

The carpet images that dominate the videotape derive from E. Dombos and her

efforts to purge the original recording of scenes that she found offensive.  During her Grand Jury testimony, Deputy Delorem recalled how E. Dombos had contacted her shortly after viewing the videotape.  R. Proper 2400.  At that time, she testified that E. Dombos had become sick after discovering the videotape's contents, and shortly thereafter, began trying to record over the offensive footage by pointing the camera at the floor and recording.  *Id.* at 2400-02.[6]  Before recording over everything on the videotape, however, E. Dombos contacted Deputy Delorem, who directed her to preserve what remained on the videotape.  *Id.*  E. Dombos testified in accord at Petitioner's trial.  Trial Tr. vol. 2, 244:5-245:21, 304:1-6, 315:13-316:2.

The relevant minute of videotape footage is dispersed across the initial eleven minutes of the videotape's footage.  Furthermore, this minute of live film is divided into five sections, three of which are interrupted, but correspond to the same scene.  Thus, fundamentally, the videotape contains three scenes, one of which is interrupted into three parts.

### i.    Scene one (dog scene)[7]

The first two seconds of film depict two women seated.  One holds a dog in her arms.  The scene ceases and cuts to carpet.

---

[6]    Specifically, according to Deputy Delorem, "[t]he carpet in the living room is where [E. Dombos] taped over the tape."  R. Proper 2403.

[7]    This scene can be found from 0:00-0:02 on the videotape.

ii.      Scene two (three-part bedroom scene)[8]

The second collection of footage reveals a male, identified at trial as Petitioner, and E. Dombos in bed.  While Petitioner's face is hidden from the camera's view, the footage shows his figure sitting on the side of the bed with his left leg folded on the bed and right foot on the floor.  Meanwhile, E. Dombos lies on the bed under Petitioner's folded left leg in varying degrees of nudity.  Throughout all three parts of this scene, Petitioner engages in an aggressive and forcible questioning of E. Dombos.  When E. Dombos attempts to roll over or sit up, Petitioner pushes her back down onto the bed and restrains her.  Nevertheless, before he can do so, the camera captures multiple bruises of varying severity across her left torso and back.

Throughout the three parts of the scene, the camera angle remains constant.  Therefore, all three parts reveal similar information about the room's contents.  A bed, bedroom wall, nightstand, lamp, linens, and pillows are all distinguishable.  Additionally, an unidentified light source can be discerned near the nightstand on the bed's far side.  Because of the camera's narrow field, however, no other features are apparent.

This scene exists in three parts because of the interposition of two scenes that seem to have been recorded later.  The first and second parts of this bedroom scene are divided

---

[8]      Approximately twenty-five (25) seconds of this scene have survived being taped over.  These three scenes can be found at 2:23-2:26, 9:55-10:12, and 10:45-10:47 on the videotape.

by E. Dombos' recording of the carpet as described above for approximately seven minutes. The second part is then separated from the third by a scene that E. Dombos testified as depicting a carrot, in the hands of Petitioner, sodomizing her.  This scene is described more fully in the next section.

### iii.     Scene three (sodomy scene)[9]

The last scene of distinct material on the videotape is also its most poorly lit.  What can be perceived is a female form, seen from mid-back to just below the buttocks, naked and lying on her stomach.  The only distinguishable feature of the perpetrator and film maker, beyond the appearance of his hand and fingers, is the light-colored sweatshirt covering his arm.  From the inception of the video, a carrot can be seen already inserted into the female's anus.  The perpetrator adjusts the female's position, secures a better hold on the camera, and then begins to sodomize the female by grabbing the carrot's end in his left hand and repeatedly thrusting the carrot in and out of the female's anus.

### B.     Effect of Additional Evidence on this Court's Recommendation

Having now augmented the record with additional evidence from all parties,[10] this Court can reassess those findings in the PFRD that remain unadopted by Judge Browning.

---

[9]      This scene can be found at 10:13-10:44.

[10]      As outlined above, Petitioner added absolutely nothing new to the record. Thus, the only additional evidence this Court will address consists of: (1) the transcript of the interview of E. Dombos by Deputy Delorem; (2) crime scene photographs; and (3) the videotape.

As stated above, those included the PFRD's recommendations with respect to: (1) Petitioner's claims of improper closing argument, (2) the significance of evidence presented against Petitioner at trial, and (3) Petitioner's claims of *Brady* and *Giglio* violations committed by the prosecutor. *Doc. 127* at 9-11. These claims will be discussed *seriatim.*

### 1. Improper closing argument

In his "Amended Habeas Corpus Petition With Consolidated Claim[]s" ("Amended Petition"), Petitioner avers that the prosecutor's closing argument "deprived [him] of a fair trial." *Doc. 70* at 2. By Petitioner's recollection, the prosecutor called him a "liar" four times, stated that the sodomy videotape proved he was a liar, claimed that the most compelling reason to convict Petitioner was that he was a "sexual deviant," and misrepresented to the jury that the court had called him a sexual deviant and a monster during closing arguments. *Id.* After I recommended dismissal of this claim in the PFRD,[11] Petitioner alleged in his Objections to the PFRD that some of the evidence he sought to add to the record, including crime scene photographs and a videotape, would demonstrate that the prosecutor was lying to the jury when he called Petitioner a liar. *Doc. 107* at 41-45. Based on these contentions, Judge Browning concluded that he could not "carefully and thoughtfully make a fully informed decision on this issue without having the evidence as part of the record." *Doc. 127* at 10. Consequently, Judge Browning sustained this objection

---

[11]      *Doc. 104* at 11-12.

so that I might "consider whether the supplemental evidence affects [my] determination."
*Id.*

Having now reviewed the supplementation proffered by all parties, I renew my recommendation that this claim be dismissed on the merits. As a threshold matter, this Court continues to construe Petitioner's pleading to advance a due process claim. *See doc. 104* at 9. Further, this Court recognizes that the NMCA adjudicated this claim in Petitioner's direct appeal, and as a consequence, this Court must proceed under the deferential standard set out in 28 U.S.C. § 2254(d). *Id.* Therefore, Petitioner must demonstrate that the State's decision was (1) contrary to or an unreasonable application of clearly established Supreme Court precedent, or (2) an unreasonable determination of the facts in light of the evidence presented in the State court proceeding. 28 U.S.C. § 2254(d).

Ordinarily, a prosecutor's misconduct will require reversal of a state court conviction only where the remark sufficiently infected the trial so as to make it fundamentally unfair, and, therefore, a denial of due process. *Donnelly v. DeChristoforo*, 416 U.S. 637, 643 (1974).[12] The Supreme Court has made clear that in these instances,

---

[12] Alternatively, however, "if the alleged prosecutorial misconduct denied the petitioner a specific constitutional right (rather than the general due process right to a fair trial), a valid habeas corpus claim may be established without proof that the entire trial was rendered fundamentally unfair." *Le v. Mullin*, 311 F.3d 1002, 1013 (10th Cir. 2002) (citing *Paxton v. Ward*, 199 F.3d 1197, 1217 (10th Cir. 1999)). These rights include, among others, the privilege against compulsory self-incrimination and the right to cross-examine witnesses. These rights are not implicated by the prosecutor's remarks in this case.

-13-

"inappropriate prosecutorial comments, standing alone, [do] not justify a reviewing court to reverse a criminal conviction obtained in an otherwise fair proceeding." *United States v. Young*, 470 U.S. 1, 11 (1985); *see Darden v. Wainwright*, 477 U.S. 168, 181 (1986) ("[I]t is not enough that the prosecutors' remarks were undesirable or even universally condemned." (internal citation omitted)).  To determine whether a trial is rendered fundamentally unfair, courts must examine the entire proceeding, "including the strength of the evidence against the petitioner, both as to guilt at that stage of the trial and as to moral culpability at the sentencing phase as well as any cautionary steps - such as instructions to the jury - offered by the court to counteract improper remarks." *Bland v. Sirmons*, 459 F.3d 999, 1024 (10th Cir. 2006) (internal quotation marks omitted).  "The ultimate question is whether the jury was able to fairly judge the evidence in light of the prosecutors' conduct." *Id.*

In the instant case, I remain unable to find anything to suggest that the jury unfairly judged the evidence based on the prosecutor's closing remarks.  What has become apparent, however, is that the representations in Petitioner's Amended Petition diverge from the record in critical respects.[13]  Specifically, the prosecutor did not inform the jury

---

[13]     The trial transcript evinces that the prosecutor called Petitioner a "sick, vile man" on one occasion and a "sexual deviant" on four.  Trial Tr. vol. 4, 577:8, 576:13, 577:13, 584:9, 608:6.  Additionally, the prosecutor referred to Petitioner as a "monster" twice.  *Id.* at 584:9, 608:6.  Finally, the prosecutor accused Petitioner of lying, uttering lies, or offering perjured Grand Jury testimony on one occasion each, for a total of three events.  *Id.* at 594:13, 597:23-598:1, 601:2.

that the trial court considered Petitioner a sexual deviant or a monster.[14]  *Id.* at 577:8-16 (emphasis added).  Likewise, the prosecutor did not urge the jury to convict Petitioner because he was a sexual deviant.  *Id.*

Petitioner's claim can be distilled to the pejorative terms by which the prosecutor described him during closing argument.  In this regard, Petitioner first contends that the remarks deprived him of a fair trial.  On direct appeal, the NMCA considered these negative characterizations and ordered dismissal of this claim.[15]  In the PFRD, I recommended the same, finding that "the remarks did not deprive [Petitioner] of a fair trial," and, moreover, that the finding of the NMCA was "neither contrary to clearly established Supreme Court precedent nor an unreasonable determination of the facts in light of the evidence presented in the state court proceeding." *Doc. 104* at 11-12.  Since that time, the supplementary evidence provided by the parties has done nothing to alter my

---

[14]     In trying to call the jury's attention to the primacy of its instructions, the prosecutor intoned, "the Court has told you that he can be a sexual deviant, he can be a violent man.  But if it doesn't fit into the jury instructions, it doesn't matter." Trial Tr. vol. 4, 577:12-15.  It appears that the prosecutor was actually reiterating to the jury that they could not find him guilty just because they did not like him.  This obviously contrasts with Petitioner's account, where he asserts "[the prosecutor] told the jury, the court has told you, he is a sexual deviant, and [a] monster." *Doc. 107* at 41.

[15]      By calling Petitioner a "liar," a "sick, vile man," a "monster," and a "sexual deviant," the NMCA found that the prosecutor "improperly sought to depict [Petitioner] as an evil person." *State v. Dombos*, 143 N.M. 668, 678 (Ct. App. 2008). Nevertheless, the NMCA held that "[a]lthough we discourage the use of such language, we cannot say that these comments fall within the categories of conduct that would deprive Defendant of a fair trial." *Id.* (*citing State v. Armendariz*, 140 N.M. 712, 720 (Ct. App. 2006)).

proposed findings.

In addition to his claim that the prosecutor's remarks "deprive[d] [him] of a fair trial," Petitioner also posits that the videotape and crime scene photographs "will show that the prosecutor was lying to the jury when he called [Petitioner] a liar."[16] *Doc. 127* at 9; *Doc. 107* at 41-42. According to Petitioner, a review of these materials "proves the video tape was impossible to be made in my N.M. home," and when compared with "the police scene photos of my real N.M. residence," confirms "they are not the same place." *Doc. 107* at 42. Thus, by Petitioner's reasoning, the prosecutor "knew [the] found video-tape [sic] was fabracated [sic] false evidence," and all reference made by the prosecutor to that tape for purposes of impeaching Petitioner constituted prosecutorial misconduct. *Id.*

Notwithstanding Petitioner's assertions, nothing in the crime scene photographs or videotape reinforces his argument. In the three-part bedroom scene, even the closest analysis of the videotape cannot confirm, when compared with the crime scene photographs, that these materials depict the same or different residences. Notably, the videotape does reveal a bedroom configuration that parallels the one in the crime scene

---

[16]     In this instance, the prosecutor accused Petitioner of offering perjured Grand Jury testimony. Immediately preceding this, the prosecutor reviewed the various inconsistent statements Petitioner had offered to law enforcement on how E. Dombos had received anal lacerations. Trial Tr. vol. 4, 597:17-22. He then reviewed Petitioner's testimony at Grand Jury that he had not sodomized his wife with a carrot. *Id.* at 597:23-25. At that point, the prosecutor pronounced to the jury, "of course, you know from the videotape that that was perjured testimony." *Id.* at 597:25-598:1.

photographs.  Furthermore, a night stand and lamp appear in the videotape that can also be  seen in the crime scene photographs.  Likewise, the bed, linens, and the wall abutting the head of the bed all seem congruous in shape and color.[17]

Naturally, the multiple similarities between the photographs and the videotape are not what have captivated Petitioner's attention.  Rather, Petitioner continues to argue that "[t]he police scene photos of my N.M. home clearly show a solid wall, the bed rest against. The videotape shows a window next to the nightstand, so I was framed in the classic sense . . ." *Doc. 70* at 3.  Unfortunately for Petitioner, neither the videotape nor the crime scene photographs conclusively portray what he would desire.

First, the crime scene photographs do not show an entire solid wall on the relevant side of the bed.  In fact, the photographs only capture a marginal area of this wall nearest the night stand, all of which comports with the images on the videotape.  Because they

---

[17]     Based on her viewing of the videotape, E. Dombos testified as follows:

Q:     Now since you gave that tape to [Deputy] Delorem, have you had a chance to view it in the D.A.'s office?
A:     Yes.
Q:     Where was the videotape produced?
A:     In my bedroom.
Q:     How do you - - what bedroom?
A:     My present bedroom.
Q:     How do you know that?
A:     Well, I could see the window in my bedroom and the nightstands there at that time.  I know that was my bedroom.

Trial Tr. vol. 2, 246:7-17.

reveal such a small area of the wall, ample room remains in the area uncaptured by film where a window could be located.

Secondly, the videotape does not clearly show a window on any wall. What can be perceived in the three-part bedroom scene is a light source emitting from the far side of the bed. What the light source is or where it originates cannot be determined, as the narrow field of the camera precludes it. While the light could be coming from a window, such a conclusion is just one possibility given what can be seen in the videotape.

Most importantly, in the scene to which the prosecutor alluded - the sodomy scene - neither a window nor walls can be discerned. The low level of lighting and first-person perspective of the footage reveal almost nothing of where the scene was filmed. At trial, the only individual able to testify on the sodomy scene's contents was E. Dombos. To that end, she testified that she knew it was Petitioner sodomizing her "[b]ecause he's left handed and I recognized the sleeve of his shirt or sweater. And I know that was my bed, and I just put it together." Trial Tr. vol. 2, 254:13-15. Although he had no burden to do so, Petitioner proffered no tangible or testimonial evidence at trial to counter the claim that the videotape was made in New Mexico. Thus, at the time the prosecutor made his closing statement that Petitioner had perjured himself at the Grand Jury, the prosecutor had uncontroverted testimony and physical evidence on which to rely.

Having reviewed the supplemental evidence proffered, I remain convinced that the prosecutor's closing remarks, while improvident, did not deprive Petitioner of a

fundamentally fair trial.  Neither the crime scene photos, nor the videotape, nor a juxtaposition thereof substantiate his challenges.  Therefore, I renew my recommendation that this claim be dismissed.

### 2.      Significant evidence of guilt

In the PFRD, I found that the evidence against Petitioner was "significant." *Doc. 104* at 11.  Because the evidence proffered at trial was significant, and because the trial court carefully and properly instructed the jury, this Court was able to recommend the dismissal of Petitioner's claim of improper closing remarks.[18]

Subsequent to the filing of the PFRD, Judge Browning reviewed the PFRD's findings.  Therein, he characterized my findings as follows:

> there was significant evidence of [Petitioner's] guilt, and because the court instructed the jury to consider only witness testimony, attorneys' stipulations, and exhibits as evidence, the [NMCA's] holding that the remarks did not deprive [Petitioner] of a fair trial was

---

[18]      Where an allegation of improper statements by the prosecutor is advanced, the strength of the state's case is a component of determining whether the petitioner still retained his right to a fundamentally fair trial.  Even in those instances where a prosecutor may utter an improper closing remark, the strength of the state's case, limiting instructions given to the jury, and a relation of those remarks to proffered evidence will serve to provide fundamental fairness to the trial.  *See Malicoat v. Mullin*, 426 F.3d 1241, 1256 (10th Cir. 2005) (concluding that improper statements by the prosecutor did not violate the defendant's due process rights in light of "the strength of the state's case and the fact that the majority of the prosecutor's argument was based upon evidence in the record"); *Hooper v. Mullin*, 314 F.3d 1162, 1173 (10th Cir. 2002) (concluding that the prosecutor's improper comments regarding the evidence did not violate due process when the evidence was substantial and the trial court instructed the jury to base its decision only on the evidence).

> neither contrary to clearly established Supreme Court precedent nor
> an unreasonable determination of the facts in light of the evidence.

*Doc. 127* at 9-10.  Based on Petitioner's numerous attestations that additional evidence

would prove these findings in error, Judge Browning held that a final decision could not

be made "without having the [supplemental] evidence as part of the record."  *Id.* at 10.

Therefore, he ordered that I consider this additional evidence and establish "whether the

supplemental evidence affects [this Court's] determination."  *Id.*

Now, having re-examined the record and all supplemental evidence proffered by

the parties, I remain convinced that the evidence against Petitioner was significant.  E.

Dombos, the victim of the crimes with which Petitioner was charged, testified at the trial

regarding each of the crimes.  Trial Tr. vol. 2, 184-332.  Her testimony was corroborated by

several sources.  One witness, who was a neighbor of Petitioner and E. Dombos, testified

about her awareness of domestic abuse committed by Petitioner against E. Dombos during

the relevant time period.  *Id.* at 160-186.  Further, E. Dombos' daughter testified about her

personal knowledge of a pattern of domestic abuse committed by Petitioner against E.

Dombos during the relevant time period.  *Id.* at 364-73.  The doctor who treated E. Dombos

after the rape testified as to the injuries E. Dombos suffered on that evening as well as to

the pervasive bruising she presented and how it was consistent with abuse over an

extended period of time.  *Id.* vol 1, 121-53.  Moreover, the nurse who conducted the sexual

assault examination of E. Dombos after the rape also testified about her significant injuries.

*Id.* vol 2, 332-63.  Finally, the videotape itself corroborates E. Dombos' testimony because it depicts Petitioner's domineering behavior toward her and the sexual assault with the carrot.

Taking the whole of Petitioner's trial into consideration and the record before this Court including the supplemental evidence, I remain convinced that significant evidence of his guilt was presented, and that his trial was fundamentally fair.  More importantly, I also maintain that the NMCA's holding that the prosecutor's closing remarks did not deprive Petitioner of a fair trial is neither contrary to clearly established Supreme Court precedent nor an unreasonable determination of the facts in light of the evidence presented in the state court proceeding.  *See* 28 U.S.C. § 2254(d).

## 3.  *Brady*, *Giglio*, and related claims

Petitioner's last surviving contention concerns the prosecutor's alleged failure to disclose *Brady* and *Giglio* information.  *Doc. 70* at 2-8.  Interwoven into this claim, Petitioner infuses the allegation that the prosecution suborned and elicited perjurious testimony from prosecution witnesses.  *Id.* at 5-6.  In the PFRD, Petitioner's myriad allegations on this claim were extensively examined.  Based on my review of the record, I recommended the dismissal of all Petitioner's *Brady*, *Giglio,* and presentation of perjurious testimony claims. *Doc. 104* at 12-24.

Following the filing of Petitioner's Objections to the PFRD, Judge Browning observed that "[s]everal of [Petitioner's] objections to [this Court's] analysis rely on

supplemental evidence that [this Court] has not allowed [Petitioner] to add to the record."
*Doc. 127* at 10.  Judge Browning also noted that "[P]etitioner, in certain objections, argues
that this evidence supports his arguments that the state committed *Brady* and *Giglio*
violations."   *Id.*   Judge Browning then sustained Petitioner's objection to my
recommendation so that this Court could "review the additional evidence that [Petitioner]
presents, and determine whether [this Court] wishes to change [its] recommendations"
regarding these claims.  *Id.* at 10-11.  Having reviewed all the supplemental evidence
presented, I renew my recommendation that these claims be dismissed on the merits.

### a.   *Brady* and *Giglio* claims

Notwithstanding Petitioner's arguments, nothing in the supplemental evidence
supports his broad accusations of the prosecutor committing *Brady*[19] and *Giglio*[20] violations.
Under Tenth Circuit precedent, "[i]n order to establish a *Brady* or *Giglio* violation, 'the
defendant bears the burden of establishing (1) that the prosecution suppressed the
evidence, (2) that the evidence was favorable to the accused, and (3) that the evidence was
material.'" *United States v. Wright*, 506 F.3d 1294, 1301 (10th Cir. 2007) (quoting *United States*

---

[19]      In *Brady v. Maryland,* the Supreme Court held that "suppression by the
prosecution of evidence favorable to an accused upon request violates due process
where the evidence is material either to guilt or to punishment, irrespective of the good
faith or bad faith of the prosecution." *Brady v. Maryland*, 373 U.S. 83, 87 (1963).

[20]      The Court announced in *Giglio v. United States* that where "the reliability
of a given witness may well be determinative of guilt or innocence, nondisclosure of
evidence affecting credibility falls within this general rule." *Giglio v. United States*, 405
U.S. 150, 154 (1972) (internal quotation marks omitted).

*v. Gonzalez-Montoya*, 161 F.3d 643, 649 (10th Cir. 1998)).  Furthermore, the Tenth Circuit has made clear that a habeas petitioner bears both the burden of persuasion and production in this context.  *See Foster v. Ward*, 182 F.3d 1177, 1191 (10th Cir. 1999) (holding that the petitioner "bears the burden of presenting evidence to establish a *Brady* or *Giglio* violation").  Petitioner has manifestly failed to meet either burden.

As a threshold matter, Petitioner has failed to show any suppression of evidence. In the PFRD, I scrutinized each claim submitted by Petitioner, and in each instance, found that Petitioner was either aware of the evidence,[21] cited to evidence not in possession of the prosecution, or waived his right against late disclosure by refusing to continue his trial setting.[22]  *Doc. 104* at 14-19.  Nothing in the additional evidence impacts these findings. Hence, I renew my recommendation that these claims be dismissed on the merits.

###### b.   Alleged presentation of false testimony

Although it represents the cornerstone of Petitioner's voluminous pleadings, nothing in the supplemental evidence supports his assertion that the prosecutor knowingly

---

[21]   If a defendant is aware of and can present the exculpatory evidence, no *Brady* violation can be sustained.  *See United States v. Erickson*, 561 F.3d 1150, 1164-65 (10th Cir. 2009).

[22]   *See United States v. Williams*, 132 F.3d 1055, 1060 (5th Cir. 1998) (defendant waived argument that he was prejudiced by disclosure of *Brady* material during trial when he elected not to take advantage of court's offer of a continuance); *see also United States v. Burke*, 571 F.3d 1048, 1055-57 (10th Cir. 2009) (where defendant's continuance motion based upon *Brady* disclosure during trial is denied, defendant's failure to present evidence of prejudice from the delay to the trial court means the argument is forfeited).

presented false testimony at his trial.  Were Petitioner able to produce evidence showing that the prosecutor knowingly presented false evidence, a due process violation would exist, regardless of whether the evidence was relevant to substantive issues or to witness credibility only.  *Napue v. Illinois*, 360 U.S. 264, 269 (1959).  To establish such a violation, Petitioner would have to show "that (1) [the witness's] testimony was in fact false, (2) the prosecution knew it to be false, and (3) the testimony was material."  *United States v. Caballero*, 277 F.3d 1235, 1243 (10th Cir. 2002).  Because Petitioner cannot satisfy even the first prong of the relevant burden, I again recommend that this claim be dismissed.

Essentially, Petitioner contends that the prosecutor suborned perjurious testimony from Deputy Delorem and E. Dombos about the location where a tube of K-Y Jelly was found and the site where the relevant videotape was filmed.  *Doc. 104* at 20; *Doc. 70* at 2-7. In light of the record and the supplemental evidence proffered by the parties, this allegation will be addressed in its component parts.

First, as highlighted in the PFRD, Deputy Delorem did not testify about where the K-Y Jelly was found.  *Doc. 104* at 20-21.  To the contrary, she admitted at trial that she "wasn't present at that time."  Trial Tr. vol. 1, 88:9-11.  Nothing in the supplementary evidence affects this fact.

Similarly, E. Dombos never testified as to where the K-Y Jelly was found.  At one point, she did testify that Petitioner kept the K-Y Jelly "[o]n his side of the bed," but never

as to where it was immediately after the rape.[23]  *Id.* at vol. 2, 221:7-24.  The crime scene

photographs, which had been disclosed to Petitioner three days before trial, leave unclear

where the K-Y Jelly was discovered.  Although certain indicia in the only photograph

showcasing the K-Y Jelly point to the tube's placement in the bathroom, only an observer

with first-hand knowledge could state with certainty where it was found.  Most

importantly, even assuming that the K-Y Jelly was shown, irrefutably, to be found in the

bathroom, it does not contravene E. Dombos' testimony that Petitioner "kept it" on his side

of the bed.  Any number of possibilities, including actions by Petitioner, could account for

the K-Y Jelly being found in the bathroom at the time of the police search.  Thus, Petitioner

cannot demonstrate that either the testimony of Deputy Delorum or E. Dombos was in fact,

false, with respect to the K-Y Jelly.

With respect to the location where the incriminating videotape was filmed,

Petitioner avers that the location pictured was not his home in New Mexico, but was

instead his home in Arizona.  *Doc. 70* at 2-7.  Based upon this belief, he claims that the

"prosecutor had his witnesses lie, knowingly at trial that the . . . videotape was made in my

N.M. home."  *Doc. 70* at 2.  Nonetheless, even with the supplemental evidence provided,

this allegation remains unproven.

This Court has reviewed the videotape and compared it with the crime scene

---

[23]      E. Dombos stated the same in her interview with Deputy Delorem
following the rape.  When asked where Petitioner kept the K-Y Jelly, E. Dombos replied,
"[u]h, he keeps it on his side of the bed."  Resp'ts' Answer, attach. 48 at 29.

photographs.  As fully described above,[24] there is no conclusive evidence that the relevant

portions of the videotape were recorded outside of New Mexico.  Despite a close

examination of these items, I cannot conclude with any certainty whether the relevant

portions of the videotape depict a room different from the room depicted in the police

scene photographs.  Deputy Delorem and E. Dombos both testified that they believed that

videotape showed Petitioner's New Mexico residence.  Trial Tr. vol. 1, 80:14-81:15, vol. 2,

246:7-17.[25]  Even with the additional evidence and acknowledging this court's role during

collateral review, Petitioner has not established that either Deputy Delorem or E. Dombos

testified falsely.  *See Barefoot v. Estelle*, 463 U.S. 880, 887 (1983) ("Federal courts are not

---

[24]      *See supra*, pp. 17-19.

[25]      As I noted in the PFRD, this contention of a dramatic and obvious
discrepancy between trial testimony and the videotape about the window's location
does not survive a close review of the record.  *Doc. 104* at 22-23.  Deputy Delorem did
not specifically testify about where the window was located.  She testified only that the
location of "various things in the bedroom" such as the window and the carpet as seen
in the videotape matched the bedroom in the New Mexico home.  Trial Tr. vol. 1, 80:14-
81:15.  The only specific testimony from E. Dombos on the window was limited to the
following:

> Q:      And if I would imagine a queen size bed being against the wall and
>         I was looking towards the bed, towards the (inaudible), where
>         would the window be?
> A:      On the left side --
> Q:      Left side.
> A:      On my side.
> Q:      Your side of the bed.
> A:      Um-hmm.

Trial Tr. vol. 2 at 247:3-10.

forums in which to relitigate state trials."); *Herrera v. Collins*, 506 U.S. 390, 400 ("federal habeas courts sit to ensure that individuals are not imprisoned in violation of the Constitution - not to correct errors of fact."); *United States v. Scheffer*, 523 U.S. 303, 313 (1998) ("A fundamental premise of our criminal trial system is that the jury is the lie detector. Determining the weight and credibility of witness testimony, therefore, has long been held to be the part of every case that belongs to the jury . . .").

Consequently, Petitioner has failed to establish the first prong of his due process claim that the prosecutor knowingly presented false evidence with respect to the K-Y Jelly or the videotape location.  Even if one were to agree with some of the inconsistencies alleged by Petitioner, he has utterly failed to establish the second prong – that the prosecutor knew the testimony of Deputy Delorem and E. Dombos to be false.  If, perhaps, the videotape so clearly and conclusively depicted a room different from that in the police scene photographs, one could infer that the prosecutor must have known that the contrary testimony of Deputy Delorem and E. Dombos was false.  However, the additional evidence is not such a smoking gun.  Not only is it difficult to see differences between the videotape and the photographs, they actually share a host of similarities as described above.  The prosecutor would have no obvious reason not to accept the testimony of two individuals who had been in the New Mexico bedroom that the videotape depicted that room. Petitioner presents no evidence – beyond the "inconsistencies are so obvious the prosecutor must have known they were lying" argument –  that the prosecutor knowingly presented

false testimony. Given that this argument fails, Petitioner has failed to establish the second

prong of this due process claim.

Because Petitioner has failed to establish two of the prerequisites for this due process

claim, I renew my recommendation that this claim be dismissed on the merits.

## III.   IMPACT OF *CULLEN V. PINHOLSTER*

As described above, I have reviewed the supplemental evidence as directed.

However, subsequent to the decision by Judge Browning to permit supplementation of the

record, the Supreme Court has addressed the issue of what materials a federal court may

properly consider when analyzing a state habeas petition under 28 U.S.C. § 2254(d). *Cullen*

*v. Pinholster*, 562 U. S. ___ , ___ (2011) (slip op., at 8-12). Without equivocation, the *Cullen*

Court announced, "We now hold that review under §2254 (d)(1) is limited to the record

that was before the state court that adjudicated the claim on the merits." *Id.* at 9. Justice

Thomas, in delivering the opinion of the Court, explained:

> Section 2254(d)(1) refers, in the past tense, to a state-court adjudication
> that "resulted in" a decision that was contrary to, or "involved" an
> unreasonable application of, established law. This backward-looking
> language requires an examination of the state-court decision at the
> time it was made. It follows that the record under review is limited
> to the record in existence at that same time - *i.e.*, the record before the
> state court.

*Id.* Ultimately, the Court reasoned that "[i]t would be contrary to [section 2254's] purpose

to allow a petitioner to overcome an adverse state-court decision with new evidence

introduced in a federal habeas court and reviewed by that court in the first instance

effectively *de novo*."  *Id.* at 9-10 (emphasis in original).

In the instant Report and Recommendation, I have examined evidence that appears to be outside the scope of the state record.[26]  Specifically, the state record did not include the two letters from Wells Fargo attached to Petitioner's First Supplement.   More importantly, the crime scene photographs may not have been in the "record before the state court."   First, I note that copies of the crime scene photographs were included in Petitioner's original 1263-page state habeas petition.   However, because the state court struck Petitioner's 1263-page habeas petition, its contents cannot properly be considered part of the state record.  *See* Resp'ts' Answer, attach. 76 at 6-7 (order of the state court judge detailing the procedural history of Petitioner's state court habeas).   The only discussion of the crime scene photographs before the trial court was over the issue of their late disclosure.   Petitioner's counsel made an oral motion at the pre-trial motions hearing to have them excluded for late disclosure.   After hearing oral argument from the parties, the trial court excluded them altogether.   R. Proper 205-06.   Because they were excluded as a discovery sanction, it does not appear that the trial court even looked at the photographs and they were certainly not made appellate exhibits.   *Id.*  On appeal, the contents of the photographs were not at issue.   Instead, Petitioner simply argued that the "crime scene" photographs were not timely disclosed and that such non-disclosure constituted

---

[26]      In fact, I did the same in the previous PFRD when I analyzed some of the crime scene photographs noted in this Report.  *See Doc. 104* at 22-23.

prosecutorial misconduct.   *See Doc. 60*, Exs. D, E, F, H, I, K, M, N, O.  Notably, Petitioner never provided any citation to the record for the photographs.  *Id*.  So, it appears that the record included only the general fact that "crime scene" photographs were not timely disclosed as opposed to including the actual photographs.  Given that Petitioner's argument requires a comparison between the contents of the videotape and the contents of the photographs, this distinction is important.  Under these circumstances, I would find that the photographs were not part of the "record before the state court."  Consequently, *Cullen* would prohibit their consideration.

If the Court adopts this finding, the analysis above regarding the alleged inconsistencies between the videotape – which is in the record before the state court – and the photographs should be disregarded.   Moreover, if I were to reconsider my recommendations in the PFRD excluding the crime scene photographs and all other items not in the state record but adding the videotape, I would reaffirm my recommendation that Petitioner's remaining claims be dismissed.

## IV.    CONCLUSION

Pursuant to Judge Browning's Order, I have reviewed the additional evidence described above.  Following a thorough review of that evidence, I conclude that Petitioner has still failed to establish that he is entitled to habeas corpus relief on any of his remaining claims.  If, pursuant to *Cullen,* this Court's reconsideration is informed only by the videotape, I would come to the same conclusion.    Accordingly, I affirm my

recommendation that his remaining claims and his petition be dismissed with prejudice.

Wherefore, **IT IS HEREBY RECOMMENDED THAT:**

Petitioner's habeas petition be dismissed with prejudice.

---

**THE PARTIES ARE FURTHER NOTIFIED THAT WITHIN 14 DAYS**[27] **OF SERVICE** of a copy of these Proposed Findings and Recommended Disposition they may file written objections with the Clerk of the District Court pursuant to 28 U.S.C. § 636(b)(1). **A party must timely file any objections with the Clerk of the District Court if that party wants to have appellate review of the proposed findings and recommended disposition. If no objections are filed, no appellate review will be allowed.**

---

UNITED STATES MAGISTRATE JUDGE

---

[27] Pursuant to an earlier Order (*Doc. 102*), Petitioner will be permitted an additional 3 days (i.e. 17 days from service) to file his objections.